Case number 25-1005, Center for Biological Diversity, Petitioner, v. Environmental Protection Agency, and Lee M. Zeldin, Administrator, United States Environmental Protection Agency. Mr. Evans for the petitioner, Ms. Fatz for response. Mr. Evans, you may proceed on your edit. Thank you, Your Honor. May it please the Court, Jonathan Evans for Petitioner, Center for Biological Diversity, with me today at Council Tables, Ryan Mehar. Section 7 of the Endangered Species Act creates an independent duty that each federal agency shall, in consultation with the expert wildlife agencies, ensure that any action it takes does not jeopardize the continued existence of endangered species or adversely modify their critical habitat. During the 11-year federal rulemaking process here, undergoing revisions of notice and comment that focused specifically on the ecological effects of the Secondary National Ambient Air Quality Standards, addressing particularly issues related to deposition, the EPA failed to adhere to the Endangered Species Act statutory requirement to consult. Indeed, it has never consulted in establishing the secondary standards. And those secondary standards, Your Honor, are specifically related to the public welfare, which is focused on vegetation and wildlife. The Clean Air Act specifically requires the administrator of the EPA to, the Clean Air Act states the administrator shall complete a thorough review every five years of air quality criteria and the National Ambient Air Quality Standards. Here EPA combined those standards for particulate matter, nitrogen oxides and sulfur oxides. And in making that review, the administrator shall specify what was requisite to protect the public welfare, including vegetation and wildlife. The record of this final rule has numerous references to the deposition related effects on endangered species and ecosystems. Yet there's no references to correspondence with the expert wildlife agencies. The remedy that the petitioner seeks here is narrow. We're simply seeking this court to order the EPA to engage in a valid effects determination, as it has done numerous times in the past. And it can do that effectively while allowing the action to proceed. So, Mr. Evans, the EPA here has, with respect to the pollutants, kept the levels the same and lowered it with respect to the third. And in that scenario, it seems very hard to show that keeping levels the same or lowering them would have an effect on species or critical habitat. And I understand CBD to be making this now perhaps clever accumulation theory. But in what sense does EPA's decision cause accumulation beyond what would already occur? That's a good question, Your Honor. I think that you look at what the unique circumstances are regarding deposition related effects. So we have an ongoing degraded baseline that has created increased acidification throughout ecosystems, like the Adirondack Mountains, where there already are levels are so high that it will take decades, even at a dramatically lower level, to reduce the impacts of sulfur oxides. The integrated science assessment that EPA put forward documents the effects of the pollution levels for nitrogen oxide and particulate matter. So I take that understanding. But on that theory, would levels of pollutants have to basically be set at zero? Because any level of pollutant, even one much lower than the ones EPA set, would cause accumulation. I mean, if you take the accumulation theory seriously, and there's already substantial deposits. I'm at this word deposition in this context. But there are substantial deposits of pollutants in the environment. On that theory, you really couldn't have any additional pollutants. Well, I think that that's an interesting question, Your Honor. And I think that there are studies that demonstrate that the standards could be lowered to reduce the long-term effects on the environment. But what we're talking about here is a question of whether the action may affect endangered species. And we have clear evidence in the record that the action does affect. The authorization of the standards that affect the entire country, all regions within the country, have effects on endangered species. Not just the deposition-related effects that will be continuing at this level, but direct effects for endangered species, such as those in the San Joaquin Valley that are affected by particulate matter, like the San Joaquin kit fox, in those areas that are out there 24-7, 365, breathing pollutants. So I think what makes the issue so compelling here is there's not only just the direct effects, but the indirect accumulation and cumulative effects of the deposition. And the entire purpose of EPA combining particulate matter, hydrogen oxides, and sulfur oxides here was to focus on the deposition-related effects. But if you look at the effects analysis that EPA conducted, that's at Joint Appendix 490 to 501, there's no discussion of deposition. They simply look at either, A, there's no effect, or there's no action, so there's no effect. They presume a legal argument that this court should apply no deference to the Agency for nitrogen oxides and for particulate matter. What they do for sulfur oxides and that no effect determination is they simply look at what's in the ambient air and how the ambient air will affect non-attainment areas, whether that design value will turn an area from non-attainment to attainment. No discussion of deposition-related effects. That ignores an important aspect of the problem and is contrary to the record, which has repeated references of the standard that EPA set here, authorizing the standard for the next five years. As the Clean Air Scientific Advisory Council said, the EPA's own committee, that these standards are not adequate to protect the environment and relay against episodic effects. And EPA – did you already have a question? I'm sorry. I don't want to bowl over you. No, I just – I mean, the way in which EPA needs to consider that in part turns on what the relevant baseline is, right? And so, I mean, there's an existing baseline of deposition of these pollutants. And I understand your position is they should be lower. But, I mean, that is – the baseline is the existing levels and the existing level of whatever pollutants have been accumulated. And so, you have to determine the effects from that baseline. You're absolutely right. Is that correct? Or do you think there should be a different baseline? No, no, you're absolutely right. The existing baseline is the conditions prior to EPA's authorization of the standard for another five years until Congress needs to reset it or reanalyze it. And as this court decided in American Rivers and Alabama Rivers for All, it's been contrary to law for EPA – or for an agency to disregard the degraded baseline. And there's no discussion in the effects analysis of the degraded baseline, of those increased acidification in ecosystems. So, that's one issue. The baseline is the EPA disregarded the degraded baseline. But in looking forward on the effects analysis – But I think the point of the degraded baseline is that if we call that the baseline, it's being degraded regardless of what EPA does. Well, no, Your Honor, because EPA has the discretion and is mandated by the Clean Air Act to set the standard for what is requisite to protect the public welfare and the environment. EPA had the discretion to lower that standard to reduce effects or to increase that standard and make the effects worse. But I guess all I'm saying is if – suppose you don't have the five-year interval. You're in the middle of it. You're at year two or something. Then there's still degradation going on, right? Correct. Right. And so, this comes up because the interval comes into play, and then EPA can either do something or can decide not to do anything. Correct, Your Honor. In this case, EPA has a congressionally mandated timeframe within the Clean Air Act that it shall review and shall specify what is requisite to protect public welfare, and that's where this trigger came into effect. EPA set the pollution standards for the entire country and decided this is what's requisite to protect the public welfare but didn't look at the effects on endangered species. Endangered species are wildlife. Whether the action will jeopardize the continued existence of endangered species is a necessary predicate for the agency making this determination, which has all the hallmarks of agency action. It's a final action of the administrator under the Clean Air Act. It's a final agency action under the Administrative Procedure Act. EPA calls this an action in its final rule published in the Federal Register, and the record here repeatedly discusses the effects of EPA's standard, which EPA clearly has discretion to change the standard. The Clean Air Act says in the judgment of the administrator, the administrator shall specify what is requisite to protect the public welfare. That has clear discretion for the agency to make a determination for better or worse. But in this case— So somebody in the interval, if somebody filed a petition for rulemaking, and just assume with me that procedurally this is okay. I'm not 100 percent sure that it is, but let's just assume that it is. So not under the statutory interval, but sometime in the interim, a party just files a petition for rulemaking and says, look, there's all kinds of environmental degradation going on. You really should exercise your discretion, even though the statutory period hasn't come up. To do something about this. You ought to change the standards because there's too much degradation going on. And then EPA declines to engage in a rulemaking. Would that be an action that has effects? Because they would have the discretion, by hypothesis, to take an action that would affect things, and they just declined to do it. I think, as the case law states, that there needs to be an affirmative agency action. So in your hypothetical, if EPA is declining to regulate where it has clear discretion, there's a question as to whether that's an affirmative agency action. Here we have— Would it be? I think it's declining to regulate case law, I think, gets a little bit more nuanced. But I think here we have a statute— But what do you think the answer is? I mean, I don't mean to press you unnecessarily, but I'm just trying to understand your theory. Because in that situation, the agency would have discretion to do something, and it opts not to. And had it done something different, that definitely would be an action that would have effects and that might trigger a consultation requirement. But it just declines to do it, even though it could. Yeah. I think that the agency's decision to not grant the petition, I think that that could be an affirmative agency action by the EPA. But here—and clearly, if there's a spectrum of decision-making, here we have the Clean Air Act specifically mandating the administrator of the EPA to review every five years and shall specify what is requisite to protect. So I think that that—clearly, again, this has all the hallmarks of agency action, the federal rulemaking process going through years of notice and comment, the consummation of an agency decision-making that has rights and obligations that flow from it and that is legally enforceable and has legal obligations as well. So I think that, in your hypothetical, that is a question that could be debated either way. But I think here in this context, we clearly have an agency action because of what the statute requires. Mr. Evans, I mean, maybe one way to think about the agency action, tell me if this is right, is that EPA unquestionably undertook a review of the standards. They ultimately left the standards the same. But what the outcome of the review is, I think, can't necessarily determine whether they took an action. So they took an action because they were reviewing the standards. And then the bottom line of that was, we're going to leave them the same. I mean, I think we would say that was an action whether they lowered it or raised it. And so I guess I'm agreeing with you. But I wonder if one way to think about it is that they undertook the review and, like, the rulemaking is a product of that review. I agree. They undertook the review. They determined that it was the action of the administrator, that the final rulemaking was an action, and the action of the administrator under the Clean Air Act is a narrower definition than any action under the Endangered Species Act, any action authorized, funding, or carrying out. So here we have the EPA, again, resetting and renewing and reauthorizing the standards for another five years. If you look at the case law, such as, like, from the Ninth Circuit, NRDC versus Houston, renewing water contracts over another period of time of 40 years, that's an agency action. And the action is, just to pick up on, I think, what Judge Rouse, what was intended to be a friendly question to you, is it the action to not change? With respect to nitrogen and particular matter, it's a separate issue with respect to sulfur, I understand. But I just want to make sure I understand the theory is that the action is the decision not to change. Decision not to change. Leave the standard authorized at the same level, the same pollution levels, for another five years until it was required to review it again. And then under the statutory language where it has authorized, funded, and carried out, are those the three criteria? Correct. Which one of those are you, if it's the decision not to change, which one of those is? We think it clearly reauthorizes the standard at the same level. So, authorizing the standard at the same level for the next five years, setting the pollution levels across the country. But then that triggered the carrying out of federal implementation plans, state implementation plans, EPA's determinations about non-attainment. The carrying out is not the action itself, not the decision itself not to leave things in place. That's not the carrying out. The carrying out is what happens as a consequence of that. Yeah, the National Ambient Air Quality Standards are the keystone of this complex regulatory framework. And authorizing the standards at that level is the keystone that sets everything else forward for the agencies to carry out over that time period of the next determination. It's not EPA itself carrying out something by the decision not to change. It's EPA's decision not to change enables subsequent carrying out. It enables EPA itself to subsequently carry out the standards as well. But also states. Yeah, and again, the Endangered Species Act talks about this consultation occurring at the earliest possible time. And at the national level, that's when it's particularly important because you have wide-ranging species like the whooping crane that are affected in different areas, and that's where you can really catch some of these issues. And I think this Court's decisions in the Renewable Fuel Standards cases provide an interesting framework that provides guidance here. In those cases, the EPA disregarded effects in the record regarding the growth energy case, and that was contrary to arbitrary and capricious. And similarly, in growth energy affirming American fuels and petrochemical manufacturers, the Court decided that held that reasonably certain is not the same as will not affect. EPA employs a similar sort of incorrect legal interpretation saying that what is reasonably certain raises the bar for a very low may affect determination at the initial stage. Once the agency that is not EPA here is not implementing the ESA, once it kind of clears that low may affect threshold, it goes over to the expert wildlife agencies where they're entitled to deference in their analysis of effects on endangered species. But here, there's no analysis of deposition-related effects on endangered species, which was the purpose of this analysis. Let me ask you, because I didn't see this in your brief, but the Clean Air Act has a pretty strong harmless error rule for procedural harm. So, I mean, failure to consult under the Endangered Species Act is a procedural harm, and under 7607D, the error must be, the statute says, this is 7607D9, big D, the error has to be so serious and related to matters of such central relevance to the rule that there's a substantial likelihood that the rule would have been significantly changed if such error had not been made. And I don't so, I mean, even if we were to agree it was an action, and we were to agree that, you know, there was some problem here, I don't see an argument that you get past this very stringent harmless error rule. Well, I think we can look at the arguments that EPA made itself in terms of past rulemakings and the arguments that were put forward by the Clean Air Scientific Advisory Council if EPA convened on this. The Clean Air Scientific Advisory Council recommended lowering standards for all three pollutants, and that's, again, at JA 300 to 301 of the Joint Appendix. Because these standards were not adequately protective of the environment and ecosystems and episodic events. And if we look at the recovery plans that were in the record from the expert wildlife agencies, talking about threats to species that are pushing them towards extinction, for example, the whooping crane talks about scientific evidence of acid rain and effects at Joint Appendix 374. You know, those, we think, are serious effects for pushing species towards extinction. We think that that is a serious error. But I also think you can look at the context of the statute. Is it a serious error that consultation with the wildlife services would lead to a substantial likelihood that the rule would be different? Well, I think we can look to this court's decisions in previous Endangered Species Act cases. For example, Petitioner was before this court involving five pesticide-active ingredients that EPA failed to conduct an effects analysis on. When EPA went through the Endangered Species Act process, for example, for cuproside, this court decided that pesticide was moot. But it decided that because EPA changed the label to change the action to reduce effects on endangered species. Therefore, it was no effect. That's not a showing that there's a substantial likelihood the rule would change in this case. But I think it's an indication that when the agency engages in an actual effects analysis, it can change the action that can result in benefits to endangered species. And if you look at the language of the statute, the Clean Air Act requires the administrator to determine what is requisite to protect the public welfare, that is vegetation and wildlife, and endangered species. And if you're pushing species towards extinction, like the whooping crane, like the Shenandoah salamander, like the Chiricahua leopard frog that specifically have recovery plans, noting that these species are harmed by the actual acid deposition effects that the administrator was considering here, but it fails to consider that, we don't think that you're able to determine if it's requisite to protect wildlife if you're pushing wildlife towards extinction. And so these are complementary statutes. If you allow the consultation process to proceed through the 11-year decision-making process, I think it can better inform the outcome. Thank you, Your Honors. Thank you. We'll give you a little time for rebuttal. Thank you. Ms. Spatz. Good morning, Your Honors. May it please the Court, Michelle Spatz representing respondents. At the heart of the issues in this case is whether EPA must go through the ESA's interagency consultation process when it seeks to simply maintain the status quo. Under the ESA and its regulations, the obligation to consult is triggered only when two factors are met. First, that there is an agency action, and second, that that action may affect ESA-listed species or critical habitat. EPA's most recent review of the secondary NAAQS for nitrogen oxides, particulate matter, and SOX, which I'm going to refer to as SOX, NOX, and PM, did not trigger an obligation to consult. Can I just ask a framing question at the outset? So you had two necessary preconditions. One is there has to be an action, and the second is the action has to have an effect. Yes. Is there anything that says that we have to decide, that a court would have to decide the first of those, regardless of the second? In other words, it's not – There would have to be both. There needs to be both, but I'm talking about what a court needs to decide. If a court were to conclude that the action, even if it was an action, that we would sustain the agency's conclusion that the action will hypothesize as an action had no effect, is there any reason to decide the action question? Is there any reason that a court is required to decide the action question in the sense that, you know, is it jurisdictional or something that it has to be engaged with, regardless of the answer to the second? No, Your Honor. If the court finds on either prong that it doesn't exist, would not need to reach – if you find that there's no effect or there may be no effect, that there wouldn't need to be a finding on the action. Okay. I was just trying to understand if the government thinks that the – what is understandably framed as a threshold question is a threshold question that necessarily has to be engaged with, or if the government is having an either-or? I think either-or would suffice. Okay. Sorry. Go ahead. Today I'm going to address that EPA did not trigger the obligation to consult in the context of the three issues raised in CBD's petition. The first being with respect to NOx and PM, EPA did not take an agency action within the meaning of the ESA and its implementing regulations. If I can ask you about that. So if the EPA undertook a years-long review process and then either lowered or raised the NOx and PM values, would that be an agency action? So with respect to SOx where the standard – Your Honor, you're saying since SOx were lowered, that was an action. Yes. So if the particulate matter and NOx were either raised or lowered, would you agree that is an action? Yes, just like SOx where they – I mean, how can it be, though, that the decision at the very end of an agency process determines whether something is an action? Like EPA undoubtedly reviewed all of this for years and then put it into a big rulemaking. And the fact that they decided to leave it the same as opposed to lower or raise, how can that be determinative of the fact that there was no action? So the review itself does not fall into the ESA's definition of an agency action. The ESA and its regulations define the agency's – I guess I'm not saying it's the review itself, but it's the review plus the decision to leave it the same. The decision to leave it the same is a choice just like raising or lowering. I guess what I'm saying is EPA set a value. That value happened to be the same as opposed to higher or lower. Why isn't that an action? We don't – at the outcome of this secondary NOx review, EPA did not set a value for NOx and PM. It left the currently valid existing standards in place. But that's the same thing as setting a value. It's setting the same value. We think that setting – leaving the standards in place doesn't constitute an authorization, a carrying out, or a funding of any action, which is how agency action is defined in the ESA. And I'll just – for example, if a review by itself where nothing is changed or modified as a result of it were sufficient to fall into that definition of agency action into the ESA, just an environmental review like under NEPA would potentially trigger ESA, which is not the case. Can I ask you this question? Go ahead. Okay. I just said – I mean, so I think there's also – I mean, the EPA argues, you know, as a remedy, if it were to lose that there should be remand without vacator because it's spent years developing this rule. But that seems to also undermine the position that there's no action here. Vacator, we think, would not be appropriate here. I understand that in part, but all your reasoning for that seems to suggest that what EPA did was an action. I'm not sure I followed that. Maybe you could explain your reasoning there. Well, you're saying that there was a – EPA argues that there shouldn't be vacator because there was a very lengthy review process, that it came to a considered judgment after this process. It made a decision. That all seems to suggest there was an action. I think the basis for not having vacator in this instance is because EPA could easily correct if any ESA errors did occur, could address those errors on remand in its ESA analysis, that there's no – That's part of the reason, but there's also other reasons that you provide that seem to suggest – you know, that seem to contradict the claim that there was no agency – relevant agency action here. Maybe you could repeat your question. Yeah. Okay. So one way to think about it is suppose that the way the NAAQS worked is that the existing levels will expire unless they were either reinstated or changed. I think that would change the analysis. Even if the standard were left the same. If they had to issue a new standard, if the previous standard expired and they had to take a new legal action to authorize a new standard, that that would be a different scenario under the ESA's agency action definition. Even if the agency undertook a lengthy analysis and decided we're not going to change the existing standard that has been in place for a long time, so we're effectively leaving the old standard in place because we're not going to change it. But if the old standard would have expired but for the re-upping, you would concede that that would be – if the statutory regime worked that way, then that would be an action that would have – would trigger the consultation requirement. If the new – if the new decision were issuing like an authorization of new standards, even if they were the same and had that legal impact, we would concede that that would be an agency action. If that hadn't happened yet, like if there was not an expiration and they just basically said we're going to leave these standards in place, like the situation we have here, that would not constitute – Well, I'm assuming the expiration hasn't happened yet, but that it would happen. So the – I mean, the agency would want to take an action before the expiration so that people could know what the standard is going to be for the next cycle. So the expiration wouldn't have happened yet. It's just that the existing standard is going to expire, say, at year five. So then the agency starts undertaking this process in year four and says, okay, this is about to expire. We need to set forth what the standard is going to be for the next five-year cycle. We looked at this. Everything seems fine. We're just going to leave it at this. I won't speak to that because I don't have that record before me, but that's not the situation here. Right, but I guess what I'm trying to understand is your theory. I assume that under your theory you would allow – and this doesn't necessarily mean that your action theory loses in this circumstance, but I'm just trying to understand the logic of your theory. If it were a five-year standard and it expires at the end of five years and then before the expiration the agency has to decide, do we keep that standard in place or do we raise it or lower it? I think it depends how it's framed. Because if they're keeping the current standard in place, I don't think that's an agency action. Even if it would expire? Even if it would expire. If you're keeping the same permit or authorization or standard in place and it's valid, it exists, and it's going to continue to do so and they're not disturbing it in any way, that doesn't authorize anything and it doesn't meet the definition under the ESA of agency action. I guess I'm surprised by that because – I mean, obviously it's your theory, but then if the agency took no action at all, there would be an expiration. And if the agency acted to authorize a new standard in its place – and I think, again, it goes back to it depends on how it's framed. Because if the agency authorizes a new standard and it just happens to be the same standard before the expiration, that's an authorization. Whereas here, that's just not what happened because there is no expiration for that. Right. I know your theory in this case. I'm just saying that you could have largely the same scenario, but for what seems to me to be potentially an important distinction for your purposes, which is that the existing standard is going to expire. It's going to expire and then the agency decides, do we keep it the same going forward or do we shift it in one direction or the other? Even if the agency decided to keep it the same, that could constitute an action for ESA purposes, even if in this case what happened doesn't constitute an action because there's no expiration. I think it would be a fact-specific inquiry on what the decision looked like, whether it was an authorization and it met that definition. And what would be the facts that could change it? Because it sounds to me like if it's going to expire no matter what, and EPA makes the decision to keep it the same, do you think that that still wouldn't be an action for ESA purposes because there wouldn't be an authorization of funding for carrying out? I don't want to cede anything just because we don't have those facts before us, but I can certainly see a scenario where that would constitute an authorization if it were framed that way, that these are new standards and they just happen to be the same as the previous standards, where instead of we're going to leave these standards in place and not disturb them. But if there's going to be an expiration, I don't think that would be possible. So I think in that scenario, you're correct that it would be an authorization, but again, I think it's a fact-specific scenario. Okay. Do you agree that the harmless error standard applies to this procedural, that this is a procedural claim to which the harmless error provision that I read earlier applies? I think that gets tricky, Your Honor, because here, while it's clear CBD disagrees with the substance of the Clean Air Act standards that were set, the issues that are presented to this court are all ESA issues. So the questions are quite narrow under the ESA. It's whether there was an action with respect to NOx and PM, whether NOx… I understand why it's tricky. Isn't ESA consultation a procedural requirement? Yes, it is. And so the harmless error rule applies to procedural harms. I guess I don't see how from the plain language of the statute it wouldn't apply here. I think that the question for the court is whether the ESA decisions were arbitrary and capricious under APA. I don't think that we get to whether the Clean Air Act rule should be vacated or changed because we're not asking a question under the Clean Air Act. That's not my question. My question is why wouldn't plaintiffs have to show that the error is more than harmless under the statutory standard in order to prevail on their ESA consultation claim? I don't know that the standard under the Clean Air Act comes into that question. Do you agree that ESA consultation is a procedural requirement? Yes, yes. Okay. And the harmless error rule applies to procedural requirements. Yes. So why would it not apply here? I'm sorry, Your Honor. I thought you were referring to some kind of provision under the Clean Air Act. I agree that there would be no harmless error here. There would be no harmless error? You mean that the error is harmless? I think there is no error, and if there were, it would not be. It would be harmless. It would be. Why does the government not argue that in its brief? I don't think it's essential to our argument, which is focused on whether the ESA determinations were arbitrary and capricious. Nobody bolsters the argument. I agree, Your Honor. If Your Honors have no further questions on the agency action prong, I'll turn to the second issue, which is the ESA effect analysis. EPA's no effect determination was reasonable and should be afforded deference under the EPA's arbitrary and capricious standard of review. Under the ESA, if an agency determines that its action will have no effect on listed species and critical habitat, it is not required to consult, and its ESA obligations end there. The regulations provide that a consequence is considered an effect of the action only when it meets two criteria, that it is reasonably certain to occur, and that it would not occur but for the agency action. Here, with respect to NOx and PM, EPA did not need to conduct an effects analysis because there was no agency action. With respect to SOx, in its secondary NOx review, EPA concluded that sulfur levels were already achieving its objectives to protect public welfare and revised the SOx standard, making it stricter to lock in progress that had already been made rather than to prompt further reductions. In fulfillment of its obligations under the ESA, EPA did conduct an effects analysis for SOx in which it looked at all monitor sites with SOx data across the country and evaluated what, if any, emissions reductions would be needed to meet the revised standard, and EPA determined that no reductions would be needed to be made. On SOx, and I see your time's about out, but just quickly on SOx, is the principal submission that you're making is that the SOx adjustment, because there was one for the secondary NOx, it couldn't have had an effect because of the primary NOx. For the few instances where monitoring sites were not already in compliance with the stricter SOx standard, which was the case for most of them, that's correct, Your Honor, that those sites would need to come in compliance with the primary standard, which is already stricter. And so the secondary standard, which is less strict than the primary, wouldn't have any but-for effects. And then would the same thing be true if the order were reversed, so the secondary one came first? Would the answer be that the primary one comes along and the agency would make the same argument that, well, actually don't worry about it because the secondary one's in place, so we're shifting the primary one, but it's not going to have any consequence? If it didn't exist at the time the decision was made, then I think it would be a different analysis. Let me make sure my colleagues don't have additional questions at this point. Thank you, Your Honors. We urge you to deny CBD's petition. Thank you. Mr. Evans, we'll give you three minutes for rebuttal. Thank you, Your Honors. I'd like to address a couple points regarding the agency action issue. Again, the action here has all the hallmarks of agency action, federal register, notice and comment, rulemaking. It is an action of the administrator under the Clean Air Act, a final agency action under the Administrative Procedure Act. It's illogical for EPA to find that tightening the sauce to improve the standards is an action, but setting the same value for nitrogen oxides in particulate matter is not an agency action. Reauthorizing the same permit, same authorization standard, has been found repeatedly by the courts, such as in NRDC v. Houston and the Turtle Island Restoration Network cases from the Ninth Circuit as being an action under this ESA. Any action, the ESA defines action broadly as any action much more broadly than the narrower definition under the Clean Air Act or the APA. The Clean Air Act requires the administrator to review every five years and shall specify what is requisite. We think that that's clearly an action. Regarding the no effects determination, again, the purpose of bringing these three pollutants together was to focus on the deposition related effects on ecosystems and the environment. EPA previously said in the earlier rulemaking that the standard was not adequately protective of ecosystems and the environment, yet here it goes through this 11-year rulemaking process. Evidence in the record demonstrates repeatedly those effects of the action, but it fails to go through seeking additional evidence from the wildlife agencies. The whole purpose it didn't reset the standard in the 2012 standard is it needs more information. It goes through this whole 11-year process to get more information, and it disregards the evidence and the input from its expert wildlife agencies. That, we think, is contrary to the Endangered Species Act. Regarding the remedy issue, just to clarify, this case we're seeking under the Administrative Procedure Act to vacate the decision. The APA states that if a court finds a decision unlawful or arbitrary and to set aside the findings that the secondary standards are requisite to protect the public welfare of wildlife when EPA didn't even look at the analysis on an endangered species and whether those species would be jeopardized. So we think that those complementary statutes really work well together here. The jeopardy analysis informs what is requisite to protect wildlife. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Henderson; Rao